# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### NORTHERN DIVISION AT KNOXVILLE

| | | |
|---|---|---|
| Donald Nichols | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Knox County, Tennessee, | ) | |
| John and Jane Doe Physician, | ) | No.: 3:11-CV-417-PLR-HBG |
| Amy Luxford, Selenia Allen, | ) | |
| Deanna Jones, Judy Simms, | ) | |
| Deborah Bunch, Melanie Adams, | ) | |
| John and Jane Doe Nurses, | ) | |
| John and Jane Doe Deputies, | ) | |
| Donald Keeble, M.D., and | ) | |
| John and Jane Doe Jailers/Guards | ) | |
| | ) | |
| *Defendants.* | ) | |

## MEMORANDUM OPINION AND ORDER

Donald Nichols filed this complaint under 42 U.S.C. § 1983 alleging that his Eighth Amendment right against cruel and unusual punishment was violated while he was incarcerated at the Knox County Detention Facility (the "Facility" or "Knox County"). On August 27, 2010, Mr. Nichols was asleep on the top bunk in his cell when he fell off the bed about four feet to the floor, scraping his head and injuring his neck. It was not until November 5, 2010 that a doctor first saw Mr. Nichols and advised him that his neck had been fractured.

Mr. Nichols alleges the defendants were deliberately indifferent to his serious medical need in violation of his constitutional rights. Presently before the court are three motions for summary judgment submitted by the remaining named defendants[1] [Doc. 41, 46, and 57]. For

---

[1] Donald Keeble was dismissed on January 24, 2012 pursuant to an Order of Voluntary Dismissal. [Docket No. 34].

the reasons discussed below, Judy Sims, Deborah Bunch, and Melanie Adams' motions for summary judgment are granted. Knox County, Amy Luxford, Selenia Allen, and Deanna Jones' motions for summary judgment are denied, and the plaintiff's claims against unnamed John and Jane Doe defendants are dismissed.

## 1. Procedural Motions

Before proceeding with the defendants' motions for summary judgment, the Court first addresses a few housekeeping motions. On December 5, 2013, Mr. Nichols moved for leave to file a sur-reply in further support of his response in opposition to the defendants' motions for summary judgment so that he could bring a recent Tennessee Supreme Court decision to this Court's attention. [Docket No. 104]. Knox County responded in opposition, arguing the Court should deny leave to file the sur-reply because the arguments contained therein are irrelevant to the issues before the Court. [Docket No. 105]. The Court will consider the relevancy of the sur-reply along with the merits and relevancy of all other arguments presented on summary judgment. Accordingly, Mr. Nichols' motion for leave to file a sur-reply is **GRANTED**.[2]

Mr. Nichols also moved for leave to file excess pages in response to defendant Amy Luxford's supplemental brief in support of her motion for summary judgment. [Doc. 117]. Nurse Luxford opposes the motion, noting that under Local Rule 7.1(d), a party's response to a supplemental brief shall be limited to five pages. Nevertheless, considering the positions of the parties, the procedural history of this case, and for good cause shown, Mr. Nichols' motion for leave to file excess pages is **GRANTED**.[3]

Finally, Knox County and Nurse Luxford have moved to strike certain portions of the

---

[2] Mr. Nichols attached his proposed sur-reply as an exhibit to the motion. As such, the Court has a copy and will be able to consider it along with the rest of the pleadings in ruling on summary judgment.

[3] As with the motion for leave to file a sur-reply, Mr. Nichols attached a copy of his proposed response to his motion for leave to file excess pages. Accordingly, the Court has a copy and will consider it when ruling on summary judgment.

expert testimony offered by the plaintiff in support of his response in opposition of summary judgment. [Docket No. 102, pp. 4-5 & No. 99, pp. 14-15]. The defendants accurately point out that Mr. Nichols' experts' testimony contains a number of legal conclusions—assertions that the defendants' acts amount to "deliberate indifference" or "constituted acts of reckless disregard." While the opinion of an expert may embrace the ultimate issue to be decided by the trier of fact, the issue embraced must be a factual one. *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) (citing Federal Rule of Evidence 704(a) and holding that an expert can testify that the discipline of the Detroit Police Department was lax, and what he believes the consequences of the lax discipline are, but cannot testify that the lax discipline policies indicate that the city was *deliberately indifferent* to the welfare of its citizens)). The defendants' motions will be **GRANTED**. Accordingly, those portions of the expert testimony reaching legal conclusions will be stricken, and the Court will not consider them in ruling on summary judgment.

## 2. Standard of Review for Summary Judgment

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Philip Morris Co., Inc.,* 8 F.3d 335, 339 (6th Cir. 1993). All facts and inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Keifer*, 301 F.3d 937, 942 (6th Cir. 2002). Courts may not resolve genuine disputes of fact in favor of the movant. *Tolan v. Cotton*, 134 S.Ct. 1861, 1863 (May 5, 2014) (vacating lower court's grant of summary judgment for "fail[ing to] adhere to the axiom that in

ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor") (internal quotations and citations omitted).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. *Celotex*, 477 U.S. at 317. To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the fact finder. *Id.* at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250.

### 3. Relevant Factual Background

On August 27, 2010, while sleeping, Mr. Nichols fell forty-nine inches from the top bunk to the floor of his cell at the Knox County Detention Facility, cutting his forehead and injuring his neck. After the fall, Mr. Nichols claims to have temporarily lost feeling in his extremities and experienced a tingling sensation in his body. His cellmate immediately alerted the guards

who called a "code blue,"[4] prompting a response from Nurses Selenia Allen and Amy Luxford. The parties' versions of the story differ considerably as to what happened next.

According to Mr. Nichols, he was on the floor unable to move his hands or arms when the nurses came in. Despite the possibility of a neck injury, Nurse Luxford proceeded to move Mr. Nichols' head, after which he felt a tingling sensation and regained the ability to move his arms and hands. Mr. Nichols asserts that he asked a guard (and maybe a nurse) to take him to the emergency room. Instead of taking him to the hospital, Nurses Luxford and Allen simply cleaned the abrasion on Mr. Nichols' forehead, gave him some ibuprofen, and put him to bed on the bottom bunk.

According to Nurse Luxford and Nurse Allen's version of the story, they responded to a code blue the evening of August 27 to find Mr. Nichols sitting up on the floor of his cell conversing in a clear, audible, even jovial manner. Nurse Luxford testified that Mr. Nichols was moving his extremities when she arrived, and there were no signs of distress. She asked Mr. Nichols if he was hurting anywhere and he pointed to the abrasion on his head, which she cleaned. Nurse Luxford testified that Mr. Nichols did not complain of any pain in his neck, tingling, or paralysis.

The following morning, Nurse Allen received word that Mr. Nichols was still in pain so she asked the guards to bring him to the medical unit for a follow-up. Mr. Nichols was able to walk to the medical unit and he was alert and oriented, however, he complained of a severe headache, dizziness, and a sharp pain in the back of his neck "like a knife." Moreover, Mr. Nichols said he had to use his hand to pick up his head, he couldn't open his mouth to eat, and his back was "scuffed up." Nurse Allen followed the Facility's muscle strain or sprain protocol

---

[4] A Code Blue is called when there is a medical emergency that requires medical staff to respond as quickly as possible.

and gave Mr. Nichols a muscle relaxer. She also noted in Mr. Nichols' chart the possible need for an x-ray referral if his pain persisted for more than 10 days. Nurse Allen had no further contact with Mr. Nichols.

The evening of August 28, Deanna Jones, another nurse, responded to a code blue for Mr. Nichols. She charted "pt lying on mat in floor of cell, [5] pain related to fall from last Thursday. Denies any other incident that would cause pain to neck and head. States he cannot sit up from pain, cannot move head. Inmate assisted by officers to sit up and ambulate into wheelchair." Nurse Jones goes on to note that Mr. Nichols' pain level was a 10 out of 10, with pain around the C1 and C2 vertebrae (right below the base of the skull). Despite medical protocol for neck and back injuries that required the nursing staff to keep the patient calm and still, Mr. Nichols was assisted into a wheelchair and taken to the medical unit for monitoring. Nurse Jones gave Mr. Nichols on a muscle relaxer under the Facility's sprain/strain protocol and "continued" the possible referral for an x-ray if there was no improvement after 10 days. Finally, Nurse Jones verbally communicated to her supervisor, Nurse Luxford, of the possible need for an x-ray if Mr. Nichols' pain persisted. Nurse Jones had no further contact with Mr. Nichols.

Mr. Nichols remained in the medical unit for three days and was discharged on August 31, 2010. During that time, Mr. Nichols interacted with Nurse Luxford and the remaining nurse defendants—Judy Sims, Melanie Adams, and Deborah Bunch. On August 28, 2010, Nurse Luxford examined Mr. Nichols. He complained of a stiff neck, but Nurse Luxford noted that he "demonstrate[d] a full range of motion with bilateral upper extremities." On the morning of August 29, Nurse Luxford charted that Mr. Nichols "easily wakes and rises to the upright position to receive morning medication." Nurse Luxford never saw or examined Mr. Nichols

---

[5] Mr. Nichols asserts that he was on the floor because he was having difficulty going to the bathroom. To get to the toilet, he had to roll off his bed onto the floor, crawl to the toilet, and climb up onto it. So that he wouldn't have to roll off the bunk onto the floor, Mr. Nichols threw his mat on the floor next to the toilet.

again.[6]

Later in the day on August 29, 2010, Nurse Adams checked Nichols' vital signs and charted that he was "calm and cooperative," and his only medical complaint was a headache. The same day, Nurse Judy Sims also examined Nichols and charted his complaint of a headache. Sims examined Nichols again on August 30, again charting that he had a headache, but clearing him to move back to the general population with an assignment to a lower-level cell and a bottom bunk. That was the last contact Sims ever had with Nichols.

Deborah Bunch also examined Nichols on August 30th, and took his temperature, blood pressure, and oxygen saturation. Bunch noted that Nichols' skin was warm and dry; his respiration was even and unlabored; and he was alert and oriented. Bunch gave Nichols medicine for his headache. On August 31, Bunch again examined Nichols, noting that he experienced a headache when he moved from one position to another.

On August 31, 2010, Mr. Nichols returned under his own power to the general population in the building where he was previously housed. He received a bottom bunk. On September 13, 2010, Mr. Nichols submitted a medical request form, saying he had neck pain and a terrible headache. The medical staff ordered ibuprofen for his pain but did not address the referral for an x-ray if pain persisted for more than 10 days. Mr. Nichols contends he had to get help from other inmates when getting up and down, and that he was in a great deal of pain during the month of September. Mr. Nichols also submitted a medical request form on September 22, however, there was no response.

Mr. Nichols was also having dental troubles at the time. Over the course of two separate appointments (on September 17 and 27), the Facility's dentist removed eight of Mr. Nichols' teeth. Mr. Nichols believed the quality of the dental care he received was "real good." He

---

[6] Nurse Luxford left her employ at the Knox County Detention Center on September 15, 2010.

continued to take ibuprofen as part of his post-operative treatment. Throughout his time in the Facility, Mr. Nichols also received medicine for a bipolar condition and for his blood pressure.

Mr. Nichols recalls making additional sick call requests in October without receiving a response. On November 1, Mr. Nichols filled out another sick call request saying, "[l]eft knee needs cortisone real bad. Neck pain still pretty stiff. Low back pain, pretty bad. Need to see Dr."[7] Two days later, a nurse (who is not a defendant in this case) examined Mr. Nichols and referred him for an x-ray. On November 5, 2010, at a local clinic, Mr. Nichols' neck was x-rayed, and doctor advised Mr. Nichols that his neck was fractured. On November 7, Mr. Nichols went to an appointment with a neurosurgeon who informed Mr. Nichols that his condition required surgery. After meeting with the neurosurgeon, Mr. Nichols returned to the detention center where he received medication that helped with his pain. Mr. Nichols' was released from the Facility on November 10, 2010, after which Mr. Nichols scheduled an appointment with the neurosurgeon. Mr. Nichols had his surgery about ten weeks later, on January 20, 2011.

**4. Analysis**

**A. Deliberate Indifference**

"Deliberate indifference" to an inmate's serious medical needs is an "unnecessary and wanton infliction of pain" in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. *Miller v. Calhoun County*, 408 F.3d 803, 812 (6th Cir. 2005) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). When a person, acting under the color of state law, abridges another's constitutional rights, 42 U.S.C. § 1983 provides civil redress. *Id.* (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989)).

---

[7] As far as the Court can tell from the record, this is the first time Mr. Nichols complained of lower back pain. Additionally, Mr. Nichols confirmed that this is the only time he requested medical attention for his left knee during his incarceration.

A claim for deliberate indifference under section 1983 has objective and subjective components. *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2004); *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)). The objective component considers whether there is a "sufficiently serious" medical need. *Id.* (citing *Farmer*, 511 U.S. at 835; *Estelle v. Gamble*, 429 U.S. at 104). The subjective component considers whether the prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown*, 207 F.3d at 867 (citing *Farmer*, 511 U.S. at 834). None of the parties argue that Mr. Nichols did not have a sufficiently serious medical need; therefore, the Court only considers whether any of the defendants had a sufficiently culpable state of mind in denying medical care.

Deliberate indifference requires more than mere negligence; it requires a mental state amounting to criminal recklessness. *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 834, 839-40). To prove the subjective component, a plaintiff must allege facts which, if true, would show a prison official: (1) "perceived the facts from which to infer substantial risk to the prisoner;" (2) "did in fact draw the inference;" and (3) "then disregarded that risk." *Santiago v. Ringle*, 734 F.3d at 591 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)). *See also Farmer*, 511 U.S. at 837; *Blackmore*, 390 F.3d at 895. In cases where the plaintiff received some treatment and the dispute is over its adequacy, "federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.6 (6th Cir. 1976)). A prison official's "failure to alleviate a significant risk that he *should* have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of

punishment." *Miller v. Calhoun County*, 408 F.3d at 813 (quoting *Farmer*, 511 U.S. at 838) (emphasis added). On the other hand, when the need for medical treatment is obvious, medical treatment that is so cursory as to amount to no treatment at all may amount to deliberate indifference. *Dominguez v. Correctional Medical Services*, 555 F.3d 543, 551 (6th Cir. 2009) (quoting *Terrance v. Northville Regional Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)).

### i.    Amy Luxford

Taking the facts pled by Mr. Nichols as true, and drawing all inferences in his favor, a jury could reasonably find that Nurse Luxford was deliberately indifferent to Mr. Nichols' serious medical need. According to Mr. Nichols' version of the events, Nurse Luxford first encountered him lying on the floor. He was paralyzed after falling from a height of approximately four feet and hitting his head. A jury could conclude from these facts that Nurse Luxford "perceived the facts from which to infer a substantial risk [of neck injury]," and "did in fact draw the inference." Instead of asking Mr. Nichols to remain still while she called for EMS per the medical protocol for a head or neck injury, Nurse Luxford actually moved his head. According to Mr. Nichols' expert's testimony, a registered nurse with Nurse Luxford's training in neurology should have immediately recognized the danger associated with a head and neck injury. She should have asked the Mr. Nichols to remain still and called for EMS or she should have had a physician evaluate him and clear his neck with an x-ray. A jury could conclude that after perceiving the risk associated with Mr. Nichols' possible neck injury, Nurse Luxford substantially disregarded it simply by moving his head without first knowing the extent of his injuries.

Moreover, Nurse Luxford's treatment of Mr. Nichols (after moving his head) consisted of cleaning the abrasion on his forehead and giving him pain relievers, and putting him in a bottom

bunk. She was aware that Mr. Nichols had fallen and hit his head (the only visible point of impact), was in a great deal of pain, and had difficulty moving his head and neck. Nonetheless, she did not immobilize Mr. Nichols' neck, call EMS, call the doctor, or later follow-up on the x-ray referrals from Nurse Allen and Nurse Jones.[8] A jury could reasonably conclude that Nurse Luxford's medical treatment was so cursory as to amount to no treatment at all in deliberate indifference to Mr. Nichols' serious medical needs. Accordingly, Nurse Luxford's motion for summary judgment will be denied.

### ii. Selenia Allen

The plaintiff has also pled sufficient facts to put his deliberate indifference claim against Nurse Allen before a jury. Nurse Allen assisted her supervisor, Nurse Luxford, when they responded to Mr. Nichols' fall the night of August 27, 2010. Considering the circumstances of his injury, Nurse Allen was presented with sufficient information from which she could have inferred a head or neck injury. Despite this, she failed to implement the Facility's protocol for head and neck injuries.

Nurse Allen performed a follow-up evaluation with Mr. Nichols the morning after his fall. He complained of a sharp pain in the back of his head "like a knife." He was dizzy, experiencing a "terrible headache," had to use his hands to hold his head up, and could not open his mouth to eat. According to the plaintiff's expert witness, Nurse Allen "should have known from her training and experience as a LPN that there was the potential of a head and/or neck injury due to the point of impact on Mr. Nichols [*sic*] frontal lobe." Despite this, Nurse Allen treated Mr. Nichols for a muscle sprain or strain and sent him back to the general prison population.

---

[8] According to Nurse Jones, it was Nurse Luxford's responsibility to follow-up on the x-ray referral.

Nurse Allen did refer Mr. Nichols for a possible x-ray if he was still in pain after 10 days; and, in doing so, she recognized the fact that Mr. Nichols may have sustained a head or neck injury. Despite this, she chose to wait for 10 days rather than immediately call the doctor or seek emergency medical treatment. A jury could conclude that this failure to act constituted a conscious disregard of a serious medical need of which Nurse Allen was aware. Accordingly, Nurse Allen's motion for summary judgment will be denied.

### iii. Deanna Jones

Mr. Nichols has pled facts sufficient to survive summary judgment and place his deliberate indifference claim against Nurse Jones before a jury. Nurse Jones responded to a code blue in the evening of August 28, the same day as Nurse Allen's follow-up visit. When Nurse Jones arrived at Mr. Nichols' cell, she found him lying on his mat on the floor beside the toilet. Mr. Nichols said that he could not sit up from pain and could not move his head. Nurse Jones had one of the guards put Mr. Nichols in a wheelchair and brought him to the medical unit. Back at the medical unit, Nurse Jones reviewed Mr. Nichols' chart and evaluated him. She took his vital signs and noted that he experienced pain in his mandible, submandible, and temporalmandibular joint in addition to the neck pain at the C1 and C2 vertebrae (the neck just below the skull). Mr. Nichols was unable to perform any range of motion with his neck and his pain level was a 10 out of 10. Nurse Jones decided to keep Mr. Nichols in the medical unit for observation. Nurse Jones treated Mr. Nichols under the muscle strain or sprain protocol and gave him pain medicine and a muscle relaxer. Finally, she "continued" Nurse Allen's x-ray referral in the chart and verbally told her supervisor, Nurse Luxford, about the possible need for an x-ray.

According to the plaintiff's expert witness, Nurse Jones' assessment was done "amazingly well, however she did nothing about the seriousness of her findings." The expert explains the signs and symptoms exhibited by Mr. Nichols were "the classic signs of a neck injury" and should have alerted Nurse Jones to look at different protocols to see if there may have been something more serious than a muscle sprain or strain. Instead, Nurse Jones moved Mr. Nichols from his cell to the medical unit without taking the precautions detailed in the Facility's head and neck injury protocol. Once in the medical unit, Nurse Jones did not call the physician to inform him of Mr. Nichols' condition or call EMS. She simply continued under the muscle strain or sprain protocol and made a note for a possible x-ray.

A jury could reasonably find that Nurse Jones was presented with sufficient factual information from which she could have inferred a substantial risk to Mr. Nichols; she in fact drew that inference; and she disregarded the substantial risk by continuing Mr. Nichols on the treatment protocol for muscle sprains or strains instead of implementing the head and neck injury protocol. Accordingly, her motion for summary judgment will be denied.

### iv. Judy Sims, Deborah Bunch, and Melanie Adams

Unlike the nurses discussed above, Judy Sims, Deborah Bunch, and Melanie Adams encountered Mr. Nichols only fleetingly during his three-day stay in the medical unit. They each checked on Mr. Nichols and dispensed pain killers and muscle relaxers to him a handful of times. Each of them was aware of the referral for a possible x-ray, however, several other nurses had already examined Mr. Nichols and chosen a course of treatment before Nurses Sims, Bunch, and Adams encountered him. Nurses Sims, Bunch, and Adams are sufficiently removed from the fall and its immediate, obvious symptoms to render their behavior negligent at most. To be sure, they did not employ the Facility's head and neck injury protocol, call the doctor, or do anything

else to draw attention to Mr. Nichols' neck. But they were not presented with a patient in the same kind of condition as Nurses Luxford, Allen, and Jones. Because these nurses' failure to adequately review Mr. Nichols' chart or contact a physician is, at most, mere negligence, their conduct does not amount to a constitutional violation. Their motions for summary judgment will be granted.

### v. Knox County

Mr. Nichols has pled sufficient facts to survive summary judgment and put his claim that Knox County was deliberately indifferent to his serious medical needs before a jury. Section 1983 does not allow plaintiffs to sue a local government under the theory of *respondeat superior*. *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (citing *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 692-94 (1988)). A plaintiff may only recover from the local government for its own wrongdoing. *Id.* Under *Monell*, the local government cannot be found liable unless the plaintiff can establish that an officially executed policy or the toleration of a custom leads to, causes, or results in the deprivation of a constitutionally protected right. *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell*, 436 U.S. at 691).

"A 'municipal' custom may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice." *Miller v. Calhoun County*, 408 F.3d 803, 814 (6th Cir. 2005) (quoting *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004)). *Monell* liability requires a showing that the custom is "so permanent and well settled as to constitute a custom or usage with the force of law." *Id.* (quoting *Doe v. Claiborne County*, 103 F.3d at 507).

Under the factors established by *Doe v. Claiborne County* and modified by *Miller v. Calhoun County*, Mr. Nichols must establish the following four factors to support a municipal liability claim under an "inaction" theory:

1. the existence of a clear and persistent pattern of mistreatment of detainees;

2. notice or constructive notice on the part of the County;

3. the County's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and

4. the County's custom was the "moving force" or direct causal link in the constitutional deprivation.

*Miller v. Calhoun County*, 408 F.3d at 815.

Mr. Nichols pled facts sufficient to satisfy these four factors. As outlined below, the record indicates Knox County lacked the appropriate medical administration to adequately oversee the nurses; the medical staff consistently failed to follow the appropriate protocol or even general operating policies; and Knox County was aware of and tolerated the inadequate care received by inmates, which a jury could find was the moving force behind Mr. Nichols' constitutional deprivation. [9]

About a year before Mr. Nichols' fall, the medical staff of the Knox County Detention Facility was reprimanded for "numerous violations of policy/procedure, post orders and directives." The violations included: (1) willful neglect of chain of command; (2)

---

[9] Mr. Nichols' pleadings also allege that he should not have been assigned a top bunk because he had knee problems that made it difficult for him to climb up into the bunk. This fact is not relevant to Mr. Nichols' deliberate indifference claim. Any difficulty in climbing to the top bunk Mr. Nichols sought to avoid is unrelated to a risk that he would roll out of the bed while sleeping. Mr. Nichols had never fallen out of the bed before, and there was no reason to believe he was at any greater risk of falling out of the bed than any other inmate.

insubordination; (3) non-emergency personal phone calls; (4) improper completion of medical documentation; and (5) lack of teamwork initiative and effort. The reprimand mentioned that these issues were not new, that they had been discussed at a staff meeting six months prior, yet there had only been "minimal improvement for some." These violations are augmented by the fact that none of the nurses deposed in this case had a clear understanding of who they were supposed to report to or go to when they needed assistance.

Moreover, prior to Mr. Nichols' injury, the Chief of Corrections was aware that Nurse Luxford was not performing her job satisfactorily. Nurse Luxford was repeatedly reprimanded for not taking her role as supervisor seriously and for failing to complete her duties. In a memorandum recommending the County terminate Nurse Luxford's employment, Nurse Luxford's supervisor noted that she failed to take her role as supervisor seriously, failed to complete her duties, and gave incomplete instructions to subordinates without following up to ensure the work was completed. Nurse Luxford's supervisor noted that, "[h]er behavior is most unproductive and has caused several mistakes in her work."

Despite the numerous shortcomings with Knox County's medical staff (of which the County clearly had notice), there is little evidence of corrective action. When the entire staff was reprimanded for the numerous violations listed above, the only resolution noted reads as follows: "Go to the DF Web and review your post orders, review policy / procedure and lead by example. We are trying to build character with a team effort." A jury could conclude that the County's response in this situation was so lacking as to constitute tacit approval of the medical staff's shortcomings.

Additionally, despite numerous issues with Nurse Luxford's performance as a supervisor, the County continued to employ her in a supervisory role. A jury could reasonably conclude that

the County's failure to remove Nurse Luxford from a supervisory position, provide Nurse Luxford with training necessary to ensure adequate job performance, or implement some other policy to ensure protocols were being followed amounted to deliberate indifference in the form of an official policy of inaction.

Finally, a jury could conclude the County's custom of allowing its medical staff to operate without clearly understanding the chain of command, proper operating procedure, and with repeated deficiencies in its treatment of inmates was the "moving force" or direct causal link in the constitutional deprivation. Specifically, the County's failure to order an x-ray for Mr. Nichols can be attributed to failure of the medical staff to appropriately document the incident and subsequent medical visits as well as the failure of the staff to follow-up on Mr. Nichols' x-ray referral.

One of the plaintiff's expert witnesses points out "[t]here does not appear to be any procedure for ensuring that Knox County's policies and procedures are actually being followed by the medical staff and correctional officers at the Detention Facility." The day after Mr. Nichols fell, Nurse Allen charted a referral for a possible x-ray if Mr. Nichols pain persisted for 10 days. That evening, Nurse Jones "continued" the referral for the x-ray and verbally discussed the referral with Nurse Luxford. Nurse Luxford testified that she would have passed the referral on to the next nurse at her shift change. After 10 days elapsed, Mr. Nichols was still in pain, as evidenced by his medical requests. Instead of getting him an x-ray per the referral, Mr. Nichols was simply given some pain relievers. Nobody followed up on the x-ray referral, called the doctor to recommend an x-ray, or even seemed to notice that Mr. Nichols may need an x-ray for two months despite there being a referral in his charts and his reports of continued pain. This neglect is a failure of the nurses to complete their duties—a failure to provide even the basic

medical care they themselves recommended Mr. Nichols receive. A jury could reasonably find that the County's failure to ensure its policies and procedures were actually being followed, that medical staff followed the chain of command, or completed their duties (including properly completing medical documentation) was the moving force behind Mr. Nichols' constitutional violation. For these reasons, the County's motion for summary judgment will be denied.

### iv. Qualified Immunity

The nurse defendants contend argue they are entitled to qualified immunity even if their conduct violated Mr. Nichols' constitutional rights. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stoudemire v. Michigan Dept. Of Corrections*, 705 F.3d 560, 567 (6th Cir. 2013) (quoting *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008)). In resolving a qualified immunity claim, the Court considers whether the facts alleged by the plaintiff establish the violation of a constitutional right, and whether the right at issue was "clearly established" at the time of the alleged misconduct. *Id.*

For the reasons discussed above, a jury could conclude that Nurse Luxford, Nurse Allen, and Nurse Jones violated Mr. Nichols' Eighth Amendment rights against cruel and unusual punishment. The courts have long held that deliberate indifference to a prisoner's serious medical needs is a violation of the of the Eighth Amendment's right to be free from cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104; *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976) ("We believe that a prisoner states a proper cause of action when he alleges that prison authorities have denied reasonable requests for medical treatment in the face of an obvious need for such attention where the inmate is thereby exposed to undue suffering or the

18

threat of tangible injury.").

Because, construing the facts pled in favor of the nonmovant, a jury could conclude that Nurse Luxford, Nurse Allen, and Nurse Jones were deliberately indifferent to Mr. Nichols serious medical needs, and because deliberate indifference to an inmate's serious medical needs violates a clearly established right, these three nurses are not entitled to qualified immunity.

### 5. **Unnamed John/Jane Doe Defendants**

The Court concludes that all section 1983 claims brought against unnamed physicians, nurses, deputies, jailers, and guards "John Doe" and "Jane Doe" must be dismissed with prejudice. Plaintiff has not timely made a motion under Federal Rule of Civil Procedure 15(a) for leave to amend his complaint to correctly identify the John and Jane Does by their real names. Plaintiff has also not timely effected service of process on the individual defendants identified in the complaint as John and Jane Doe as required by Federal Rule of Civil Procedure 4(m).

Section 1983 does not contain a statute of limitation. Where Congress does not specify a period of limitations in a federal statute for bringing a civil action, the court is required to apply the most analogous statute of limitations provided under the laws of the State of Tennessee. *Wilson v. Garcia*, 471 U.S. 261 (1985); *Eidson v. State of Tennessee Dept. of Children's Services*, 510 F.3d 631, 634 (6th Cir. 2007). Tenn. Code Ann. § 25-3-104(a)(3) provides that actions brought under the federal civil rights acts shall be commenced within one year after the cause of action accrues. *Roberson v. Tennessee*, 399 F.3d 792, 794 (6th Cir. 2005).

The statute of limitations accrues and commences to run when the plaintiff knows or has reason to know of the injury that is the basis of the complaint. *Kelly v. Burks*, 415 F.3d 558, 561 (6th Cir. 2005). Any cause of action that Mr. Nichols may have against John Doe or Jane Doe in

their individual capacities under section 1983 accrued, at the latest, on November 5, 2010, the date when Mr. Nichols' fracture was diagnosed. Consequently, Mr. Nichols had one year from November 5, 2010 to file suit on his section 1983 claims. On November 5, 2011, the statute of limitations expired on any cause of action that Mr. Nichols may have against John Doe or Jane Doe in their individual capacities under section 1983. Because Mr. Nichols did not amend his complaint prior to that date to identify John Doe or Jane Doe by their real names and add them as defendants to this action, any section 1983 claims against them are time barred.

Until the plaintiff files an amended complaint under Rule 15 that identifies and adds or joins a John Doe defendant by his true name, the John Doe allegations in the complaint are mere surplusage. *Pierce v. Hamblen County, Tennessee*, 2009 WL 2996333, *1 (E.D.Tenn. Aug 17, 2009). A civil action is commenced against a John Doe defendant when the complaint is amended under Rule 15 to specifically name and identify that defendant by his true name and the plaintiff effects service of process on that named defendant in compliance with Rule 4. The unknown John Doe and Jane Doe in Mr. Nichols' complaint have never been properly joined in this lawsuit and served with process.

It is too late at this juncture for Mr. Nichols to make a motion under to Rule 15(a) for leave to amend his complaint to identify John Doe and Jane Doe by their real names and add or join them as individual defendants in this case. The scheduling order provides that the deadline for joinder of additional parties is 180 days before trial, which has expired.

Even if Mr. Nichols now knows or could determine the real names of John Doe and Jane Doe, a motion to amend his complaint under Rule 15 at this point in time to correct the problem would be futile. It is too late to add or substitute new defendants into this case. The federal civil rights claims brought against John Doe and Jane Doe in their individual capacities under section

1983 are time-barred by the statute of limitations. New party defendants may not be added to a complaint after the statute of limitations has run. If plaintiff were to attempt to amend his complaint to identify John Doe and Jane Doe by their real names, the amendment would not relate back under Rule 15(c)(1) to the date when the original complaint was filed for purposes of applying the statute of limitations.

Federal Rule of Civil Procedure 15(c)(1)(C)(ii) provides that an amendment to a pleading relates back to the date of the original pleading when the amendment changes the party or the naming of a party against whom a claim is asserted if the party to be brought in by amendment "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." A plaintiff's lack of knowledge pertaining to an intended defendant's identity does not constitute a "mistake concerning the proper party's identity" within the meaning of Rule 15(c)(1)(C)(ii). Amending a complaint to add or substitute a named defendant for an unknown John Doe defendant is considered a change in the parties, not a mere substitution of parties. *Moore v. Tennessee*, 267 Fed. Appx. 450, 455-56 (6th Cir. 2008); *Force v. City of Memphis*, 1996 WL 665609, *3-4 (6th Cir. Nov. 14, 1996); *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996); *Pierce v. Hamblen County, Tennessee*, 2009 WL 2996333 at *1-2; *Dubose v. City of Morristown*, 2009 WL 1766008, *6 (E.D. Tenn. June 22, 2009).

Additionally, Mr. Nichols' claims against John Doe and Jane Doe are also dismissed on the alternative ground that Mr. Nichols failed to identify them by their real names and effect service of process upon them within 120 days from the filing of the original complaint as required by Rule 4(m). *Dubose*, 2009 WL 1766008 at *6; *Doughty v. City of Vermillion*, 118 F.Supp.2d 819, 821 n.1 (N.D. Ohio 1999). Accordingly, all § 1983 federal civil rights claims brought against unnamed John Doe and Jane Doe in their individual capacities will be dismissed

with prejudice.

**6.      Conclusion**

In light of the foregoing discussion, the plaintiff's motion for leave to file extra pages and his motion to file a sur-reply [Docket Nos. 104 & 117] are **GRANTED.**  The defendants' motions to strike the legal conclusions in the plaintiffs' experts' testimony is **GRANTED.** Nurse Luxford's motion for summary judgment [Docket No. 46] is **DENIED**; Knox County's motion for summary judgment [Docket No. 57] is **DENIED**; and the motion for summary judgment filed by Nurses Adams, Allen, Bunch, Jones, and Simms [Docket No. 41] is **GRANTED IN PART** with respect to the claims against Nurses Adams, Bunch, and Simms and **DENIED IN PART** with respect to the plaintiff's claims against Nurses Allen and Jones. Finally, the claims brought against unnamed John Doe and Jane Doe defendants are **DISMISSED** with prejudice.

**It is so ORDERED.**

_____
**UNITED STATES DISTRICT JUDGE**